UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Ilya Khait, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> - against - <br><br> Comcast Corporation, <br><br> Defendant | 1:23-cv-01877 <br><br> Class Action Complaint <br><br> Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. Comcast Corporation ("Defendant") is a telecommunications and media conglomerate which operates Universal Studios, a leading movie producer.

2. The success of a movie is based on multiple factors, and "advertising efforts have a statistically significant impact on [its] box-office performance and life cycle."

3. These efforts include "press kits, interviews with the actors and actresses appearing in the film, web pages, movie premieres, award shows and festivals [though] the most utilized and noted by audiences is the preview or trailer for the film."

4. According to academic studies, trailers are "excerpts from the film [which] represent and promote its overall tone and genre, story and star(s) … enable[ing] the moviegoer to decide whether the film is what they would want to watch."[1]

5. Movie stars function as a "signal" to the public, indicating a level of quality and

---

[1] Jörg Finsterwalder et al. "The effects of film trailers on shaping consumer expectations in the entertainment industry – A qualitative analysis." Journal of Retailing and Consumer Services 19.6 (2012): 589-595.

investment made by the film's producers, contributing to them seeing the movie.

6. This is because "actors [] have an impact on audiences' preferences [and] can be determinative in terms of movie expectations of audiences."[2]

7. In "the first rigorous exploration of the disparate range of audience perspectives on, and responses to, the trailer," one academic surveyed over 500 viewers to determine "what specific textual details audiences remember and why."[3]

8. They determined "that predictable categories dominate [such as] star (or cast) [and] recur across these responses, and appear to confirm academic research."

9. Of the 280 respondents who identified three aspects of the sample trailer they viewed, 32% referenced "Star/actor/cast (including specific reference to actor's body)," seven percent greater than any other attribute.

10. In 2019, Defendant released the movie "Yesterday" ("Movie") about an alternate universe where the Beatles never existed.

11. The trailers, shown in theaters and online, and other promotional materials, featured Hollywood's fastest rising star, Cuban-born actress Ana de Armas, as having a significant role in a love triangle with the film's protagonist, Jack Malik, which affected the plot's outcome.

12. The focus on de Armas capitalized on her "star buzz," shown through metrics including the intensity of internet searches based on her name, her then-recent selection to star in an upcoming James Bond film, and public interest in her personal life which was the subject of

---

[2] Elif Ulker-Demirel et al., "Marketing and consumption of art products: The movie industry." Arts and the Market (2018).
[3] Keith M. Johnston et al., "Watching the trailer: Researching the film trailer audience." Participations 13.2 (2016): 56-85.

significant media attention.[4]

13. However, despite the marketing for Yesterday and expectation by moviegoers de Armas would be in the movie, she had no role in the film when it was released to the public.

## Jurisdiction and Venue

14. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

15. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

16. Plaintiff is a citizen of Illinois.

17. Defendant is a citizen of Pennsylvania.

18. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

19. The members of the class Plaintiff seeks to represent are more than 100, because Yesterday was advertised with de Armas in trailers and through other promotional efforts, and hundreds of thousands of people paid to watch it, whether in theaters or through online streaming services such as Amazon.com, Apple, Google and others, in the States Plaintiff seeks to represent.

20. Venue is in this District with assignment to the Eastern Division because Plaintiff resides in Cook County and a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's viewing of the movie in reliance on the representations identified here, and subsequent awareness these were false and misleading.

---

[4] Ekaterina V. Karniouchina, "Impact of star and movie buzz on motion picture distribution and box office revenue." International Journal of Research in Marketing 28.1 (2011): 62-74.

Parties

21. Plaintiff Ilya Khait is a citizen of Glenview, Cook County, Illinois.

22. Defendant Comcast Corporation is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania.

23. Plaintiff believed, based on marketing for the movie described here, which he saw, that de Armas was in Yesterday.

24. Plaintiff paid to view Yesterday, expecting to see a movie where de Armas had a role.

25. Plaintiff was unaware de Armas was not in Yesterday.

26. As a result of the false and misleading representations, the price of the movie was no less than $12 per ticket in a movie theater, and not less than $3.99 when rented online, or close to $15 for purchasing a copy of the movie.

27. Plaintiff paid no less than the above prices to see Yesterday, and had he known de Armas did not have any role, he would not have seen it or would have paid less.

28. Plaintiff chose between Yesterday and other movies advertised as having leading stars, but which did not misrepresent the role of those stars in their respective films.

Class Allegations

29. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons excluding Judges who may hear this action, their immediate families and direct staff, in the State of Illinois who viewed Yesterday in any format during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of South Dakota, Wyoming, Idaho, Alaska, West Virginia, Arkansas, North Carolina, and Utah who viewed Yesterday in any format during the statutes of limitations for each cause of

4

action alleged.

30. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

31. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

32. Plaintiff is an adequate representative because his interests do not conflict with other members.

33. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

34. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

35. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

Illinois Consumer Fraud and Deceptive Business Practices Act<br>("ICFA"), 815 ILCS 505/1, *et seq.*<br>(Illinois Class)

36. Plaintiff seeks to represent Illinois consumers who viewed Yesterday and expected de Armas was in the movie, and who watched the movie within the statute of limitations for the ICFA.

37. Such persons expected de Armas was in Yesterday because she was a leading Hollywood star who was promoted as in the film and having a key role.

38. Defendant's false, misleading, and deceptive representations and omissions are material in that they were and are likely to influence the decisions of moviegoers.

39. Viewers of Yesterday in Illinois during the statute of limitations would not have seen

it or would have paid less if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

40. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

41. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

42. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

43. The movie was advertised and marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that de Armas had a key role or even a minimal role, even though she had no role.

44. Defendant directly marketed the Movie to Plaintiff through its advertisements and marketing, through various forms of media, in trailers, interviews with cast, digital media, advertising through third-parties, print circulars, direct mail, descriptions, and/or targeted digital advertising.

45. Defendant knew the movie attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires, such as the role of a leading movie star, a signal of quality.

46. Defendant's representations about the movie were conveyed in writing and promised

it would be defect-free, and Plaintiff understood this meant that de Armas had a key role or even a minimal role, even though she had no role.

47. Defendant's representations affirmed and promised that de Armas had a key role or even a minimal role, even though she had no role.

48. Defendant described the movie so Plaintiff believed de Armas had a key role or even a minimal role, even though she had no role, which became part of the basis of the bargain that it would conform to its affirmations and promises.

49. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the movie.

50. This duty is based on Defendant's outsized role in the market for movies, one of Hollywood's original "Big Six" film studios.

51. Plaintiff became aware of Defendant's breach of the movie's warranties.

52. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the movie's warranties.

53. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

54. The movie did not conform to its affirmations of fact and promises due to Defendant's actions.

55. The movie was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on its promotional materials, billboards, posters, packaging, container, or label, because it was marketed to Plaintiff as if de Armas had a key role or even a

minimal role, even though she had no role.

56. The movie was not merchantable because Defendant had reason to know the particular purpose for which it was seen by Plaintiff, because he expected de Armas had a key role or even a minimal role, even though she had no role, and he relied on Defendant's skill and judgment to select or furnish such a suitable movie.

### Negligent Misrepresentation

57. Defendant had a duty to truthfully represent the movie, which it breached.

58. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, as one of the leading film studios in the world.

59. Defendant's representations regarding the movie went beyond the specific representations it made through trailers and other materials, as they incorporated its extra-labeling promises and commitments to filmgoers, as custodians of cinema for close to one hundred years.

60. These promises were outside of the standard representations that other companies may make in a standard arms-length context.

61. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

62. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his viewing of the movie.

### Fraud

63. Defendant misrepresented and/or omitted the attributes and qualities of the Movie to Plaintiff, because he expected de Armas had a key role or even a minimal role, even though she had no role.

8

64. Moreover, the records Defendant is required to maintain provided it with actual and constructive knowledge of this falsity or deception, through statement and omission, of the representations.

65. Defendant knew of the issues described here yet did not address them.

66. Defendant's fraudulent intent is evinced by its knowledge that de Armas was the most popular and well-known movie star, who had drawing power to get consumers to see the movie.

### Unjust Enrichment

67. Defendant obtained benefits and monies because the movie was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Awarding monetary, statutory and/or punitive damages and interest;
3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and
4. Other and further relief as the Court deems just and proper.

Dated: March 26, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021

(516) 268-7080
spencer@spencersheehan.com